# HASTINGS AND DAKOTA RAILROAD COMPANY
## *v.* WHITNEY.

ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 49.   Argued October 31, November 1, 1889. — Decided December 9, 1889.

So long as a homestead entry, valid upon its face, remains a subsisting entry of record whose legality has been passed upon by the land authorities, and their action remains unreversed, it is such an appropriation of the tract as segregates it from the public domain, and precludes it from a subsequent grant by Congress.

A defect in a homestead entry on public land in Minnesota made by a soldier in active service in Virginia during the war, caused by want of the requisite residence on it, was cured by the act of June 8, 1872 " to amend an Act relating to Soldiers' and Sailors' Homesteads," 17 Stat. 333, c. 338, § 1 (Rev. Stat. § 2308).

While the decisions of the Land Department on matters of law are not binding on this court, they are entitled to great respect.

THE case is stated in the opinion.

*Mr. Gordon E. Cole* for plaintiff in error.

No appearance for defendants in error.

MR. JUSTICE LAMAR delivered the opinion of the court.

This is an action, somewhat in the nature of a suit in equity, originally brought in the District Court of Ramsey County, Minnesota, by the Hastings and Dakota Railroad Company, (a corporation organized under the laws of that State,) against Julia D. and John Whitney, to recover a tract of about eighty acres of land situated in that county, for which the defendants have a United States patent.

The material facts in the case are undisputed, and are substantially as follows: By the act of July 4, 1866, Congress granted to the State of Minnesota, for the purpose of aiding in the construction of a railroad from Hastings, through the counties of Dakota, Scott, Carver, and McLeod, to such point on the western boundary of the State as the legislature of the

State might determine, every alternate section of land, designated by odd numbers, to the amount of five alternate sections per mile on each side of the road. The act further provided that "in case it shall appear that the United States have, when the lines or route of said roads are definitely located, sold any section, or part thereof, granted as aforesaid, or that the right of preëmption or homestead settlement has attached to the same, or that the same has been reserved by the United States for any purpose whatever, then it shall be the duty of the Secretary of the Interior to cause to be selected, for the purposes aforesaid, from the public lands of the United States nearest to the tiers of sections above specified, so much land in alternate sections or parts of sections, designated by odd numbers, as shall be equal to such lands as the United States have sold, reserved or otherwise appropriated, or to which the right of homestead settlement or preëmption has attached as aforesaid, which lands, thus indicated by odd numbers and sections, by the direction of the Secretary of the Interior, shall be held by said State of Minnesota for the purposes and uses aforesaid." 14 Stat. 87, c. 168, § 1.

On the 7th of March, 1867, the legislature of Minnesota accepted this grant, and transferred it over to the plaintiff. The railroad company complied with all the terms and conditions of the acts of Congress and of the legislature of the State of Minnesota, and, on or about the 7th of March, 1867, definitely located its line of road by filing its map in the office of the Commissioner of the General Land Office.

The land which is the subject of this controversy fell within what are known as the ten-mile limits of the aforesaid grant, when the line of road was definitely located.

The case being brought on for trial on evidence produced by the respective parties, the court made and filed its findings of fact and conclusions of law, the essential parts of which are as follows :

"Claiming to act under the provisions of section 2293 of the Revised Statutes of the United States, one Bentley S. Turner, on the 8th of May, 1865, then being a soldier in the army of the United States, and actually with his regiment in the State

of Virginia, made an affidavit and caused the same to be filed in the local land office of the district wherein said land was situate. Said affidavit was made before his commanding officer in the State of Virginia, and stated that said Turner was the head of a family, a citizen of the United States, and a resident of Franklin County, New York. Application was made through one Conwell, whom said Turner constituted his attorney for that purpose, upon said affidavit, to enter said land as a homestead. Said affidavit did not state that Turner's family or any member thereof was residing on the land, or that there was any improvement thereon.; and, as a matter of fact, no member of his family was then residing, or ever did reside, on said land, and no improvement whatever had ever been made thereon by any one. Thereupon, upon being paid their fees by said Conwell, the register and receiver of said land office allowed said entry, and the same stood upon the records of said local land office and upon the records of the General Land Office uncancelled until September 30th, 1872, when said entry was cancelled by the proper officers of the United States. It does not appear that any specific reason was assigned for said cancellation; nor does the reason for said cancellation appear, save as it may be furnished by the facts aforesaid. On the 7th day of May, 1877, without notice to the plaintiff, the defendant, Julia D. Whitney, then a single woman, by name Julia D. Graham, who has since intermarried with said defendant, John Whitney, did enter said land at the local land office as a homestead, and thereafter, in the usual course of business, the officers in charge of the General Land Office of the United States caused a patent of the United States for said land to be issued in due form, and delivered to said defendant Julia, who ever since May 7th, 1877, has been and now is in the actual occupancy of said premises, holding the same under said patent. Said land is of the value of six hundred dollars ($600)."

After making these findings of fact, and holding as a conclusion of law that the alleged entry of Turner was absolutely void, that the title to the land in dispute was, under the land grant to the State, vested in the plaintiff, and that the entry

of Julia D. Whitney thereon was unauthorized and of no effect, the court entered a decree in favor of the plaintiff in error.

On an appeal by the defendant to the Supreme Court of the State that decree was reversed, without any order for a new trial. 34 Minnesota, 538. Such reversal, under the laws of Minnesota, is, in effect, the final judgment of the highest court of that State in which a decision of the cause could be had, and the case has been brought here by a writ of error.

Section 1 of the act of March 21, 1864, 13 Stat. 35, (now section 2293 of the Revised Statutes,) under which Turner's homestead entry was made, provides as follows:

"In case of any person desirous of availing himself of the benefits of this chapter, but who, by reason of actual service in the military or naval service of the United States, is unable to do the personal preliminary acts at the district land office which the preceding sections require, and whose family, or some member thereof, is residing on the land which he desires to enter, and upon which a *bona fide* improvement and settlement have been made, such person may make the affidavit required by law before the officer commanding in the branch of the service in which the party is engaged, which affidavit shall be as binding in law, and with like penalties, as if taken before the register or receiver; and upon such affidavit being filed with the register by the wife or other representative of the party, the same shall become effective from the date of such filing, provided the application and affidavit are accompanied by the fee and commissions as required by law."

The question presented for our consideration is, whether, upon the facts found and admitted, the homestead entry of Turner upon the land in controversy excepted it from the operation of the land grant under which plaintiff in error claims title.

The doctrine first announced in *Wilcox* v. *Jackson*, 13 Pet. 498, that a tract lawfully appropriated to any purpose becomes thereafter severed from the mass of public lands, and that no subsequent law or proclamation will be construed to embrace it or to operate upon it, although no exception be made of it, has been reaffirmed and applied by this court in such a

great number and variety of cases that it may now be regarded as one of the fundamental principles underlying the land system of this country.

In *Witherspoon* v. *Duncan*, 4 Wall. 210, this court decided, in accordance with the decision in *Carroll* v. *Safford*, 3 How. 441, that "lands originally public cease to be public after they have been entered at the land office, and a certificate of entry has been obtained." And the court further held that this applies as well to homestead and preëmption as to cash entries. In either case, the entry being made, and the certificate being executed and delivered, the particular land entered thereby becomes segregated from the mass of public lands, and takes the character of private property. The fact that such an entry may not be confirmed by the land office on account of any alleged defect therein, or may be cancelled or declared forfeited on account of non-compliance with the law, or even declared void, after a patent has issued, on account of fraud, in a direct proceeding for that purpose in the courts, is an incident inherent in all entries of the public lands.

In the light of these decisions the almost uniform practice of the department has been to regard land, upon which an entry of record valid upon its face has been made, as appropriated and withdrawn from subsequent homestead entry, preëmption settlement, sale or grant until the original entry be cancelled or declared forfeited; in which case the land reverts to the government as part of the public domain, and becomes again subject to entry under the land laws. The correctness of this holding has been sustained by this court in the case of *Kansas Pacific Railway* v. *Dunmeyer*, 113 U. S. 629, and the principle applied to a railroad grant act, which contained the same exceptions as those embodied in the act under which the plaintiff in error claims title to the tract in controversy. In that case a homestead claim had been made and filed in the land office by one Miller, and there recognized by a certificate of entry, before the line of the company's road was located. Subsequently to the location he abandoned his entry and took a title under the railroad company, and his homestead entry was cancelled. One G. B. Dunmeyer then entered the land under the home-

stead law, claiming that, by the cancellation for abandonment, it had passed back into the mass of public lands and was not brought within the grant; and upon that claim ousted the defendant in error, who afterwards brought his action against the railroad company for a breach of covenant, obtaining a judgment in the court below, which was afterwards affirmed by this court.

The court said, Mr. Justice Miller delivering its opinion:

"The record shows that, on July 25, 1866, Miller made a homestead entry on this land which was in every respect *valid*. . . . It also shows that the line of definite location of the company's road was first filed . . . September 21, 1866." p. 634.

*    *    *    *    *

"In the language of the act of Congress, this homestead claim had *attached* to the land, and it therefore did not pass by the grant. Of all the words in the English language, this word *attached* was probably the best that could have been used. It did not mean mere settlement, residence, or cultivation of the land, but it meant a proceeding in the proper land office, by which the inchoate right to the land was initiated. It meant that by such a proceeding a right of homestead had fastened to that land, which could ripen into a perfect title by future residence and cultivation. With the performance of these conditions the company had nothing to do." p. 644.

*    *    *    *    *

"It is argued by the company that, although Miller's homestead entry had attached to the land, within the meaning of the excepting clause of the grant, before the line of definite location was filed by it, yet when Miller abandoned his claim, so that it no longer existed, the exception no longer operated, and the land reverted to the company — that the grant by its inherent force reasserted itself and extended to or covered the land as though it had never been within the exception.

"We are unable to perceive the force of this proposition." p. 639, 640.

*    *    *    *    *

" No attempt has ever been made to include lands reserved to the United States, which reservation afterwards ceased to exist, within the grant, though this road, and others with grants in similar language, have more than once passed through military reservations for forts and other purposes, which have been given up or abandoned as such reservations, and were of great value. Nor is it understood that, in any case where lands had been otherwise disposed of, their reversion to the government brought them within the grant.

" Why should a different construction apply to lands, to which a homestead or preëmption right had attached? Did Congress intend to say that the right of the company also attaches, and whichever proved to be the better right should obtain the land ? "   p. 641.

Counsel for plaintiff in error contends that the case just cited has no application to the one we are now considering, the difference being that in that case the entry existing at the time of the location of the road was an entry valid in all respects, while the entry in this case was invalid on its face, and in its inception; and that this entry having been made by an agent of the applicant, and based upon an affidavit which failed to show the settlement and improvement required by law, was, on its face, not such a proceeding, in the proper land office, as could attach even an inchoate right to the land.

We do not think this contention can be maintained. Under the homestead law three things are needed to be done in order to constitute an entry on public lands : First, the applicant must make an affidavit setting forth the facts which entitle him to make such an entry; second, he must make a formal application ; and, third, he must make payment of the money required. When these three requisites are complied with, and the certificate of entry is executed and delivered to him, the entry is made — the land is entered. If either one of these integral parts of an entry is defective, that is, if the affidavit be insufficient in its showing, or if the application itself is informal, or if the payment is not made in actual cash, the register and receiver are justified in rejecting the application. But if, notwithstanding these defects, the application is

allowed by the land officers, and a certificate of entry is de-
livered to the applicant, and the entry is made of record, such
entry may be afterwards cancelled on account of these defects
by the Commissioner, or on appeal by the Secretary of the
Interior; or, as is often the practice, the entry may be sus-
pended, a hearing ordered and the party notified to show by
supplemental proof a full compliance with the requirements of
the department; and on failure to do so the entry may then
be cancelled.  But these defects, whether they be of form or
substance, by no means render the entry absolutely a nullity.
So long as it remains a subsisting entry of record, whose
legality has been passed upon by the land authorities, and
their action remains unreversed, it is such an appropriation of
the tract as segregates it from the public domain, and there-
fore precludes it from subsequent grants.  In the case before
us, at the time of the location of the company's road, an exam-
ination of the tract books and the plat filed in the office of the
register and receiver, or in the land office, would have dis-
closed Turner's entry as an entry of record, accepted by the
proper officers in the proper office, together with the applica-
tion and necessary money — an entry the imperfections and
defects of which could have been cured by a supplemental
affidavit or by other proof of the requisite qualifications of
the applicant.  Such an entry attached to the land a right
which the road cannot dispute for any supposed failure of the
entryman to comply with all the provisions of the law under
which he made his claim.  A practice of allowing such con-
tests would be fraught with the gravest dangers to actual
settlers, and would be subversive of the principles upon which
the munificent railroad grants are based.

As was said in the *Dunmeyer case, supra:*

"It is not conceivable that Congress intended to place these
parties [homestead and preëmption claimants on the one hand
and the railway company on the other] as contestants for the
land, with the right in each to require proof from the other of
complete performance of its obligation.  Least of all is it to be
supposed that it was intended to raise up, in antagonism to all
the actual settlers on the soil, whom it had invited to its occu-

pation, this great corporation, with an interest to defeat their claims, and to come between them and the government·as to the performance of their obligations." p. 641.

A question somewhat analogous, in principle, to the one in this case, arose in *Newhall* v. *Sanger*, 92 U. S. 761. In that case, Newhall claimed under a patent issued to the Western Pacific Railroad Company for land supposed to be within the grant made by the act of July 1, 1862, 12 Stat. 489, c. 120, and that of July 2, 1864, 13 Stat. 356, c. 216, and Sanger claimed under a subsequent patent which recited, among other things, that the former patent had been erroneously issued. The land in controversy had been within the boundaries of a claim made under a Mexican grant, which was pending in the Land Department of the United States at the time the order withdrawing the railroad lands from entry was made. The Mexican claim was rejected a few days thereafter because of its fraudulent character. Under that state of facts, the contention of the railroad company was, that, the Mexican claim having been declared invalid, the land in controversy became subject to the operation of the granting acts, and, therefore, passed to the company. But this court declared otherwise, and held that the land never became subject to the grant, and that the claimant under the second patent had the better title.

In addition to this, section 2308 of the Revised Statutes provides:

"Where a party at the date of his entry of a tract of land under the homestead laws, or subsequently thereto, was actually enlisted and employed in the Army or Navy of the United States, his services therein shall, in the administration of such homestead laws, be construed to be equivalent, to all intents and purposes, to a residence of the same length of time upon the tract so entered," etc.

That act is a curative act, or, rather, one putting a construction upon the prior act of 1864, under which the Turner entry was made. The effect of it is to declare service in the Army or Navy of the United States by the applicant, at the date of an entry made under the act of 1864, equivalent to actual residence upon the land by him. In that view of the case the affi-

davit in the Turner entry was sufficient; for, in contemplation of law, he was then residing upon the tract embraced in his entry.

The conclusion at which we have arrived is in harmony with the later rulings of the Land Department. See *Graham* v. *Hastings & Dakota Railroad*, (this case,) 1 Land Dec. 380; *St. Paul &c. Railway* v. *Forseth*, 3 Land Dec. 457; *So. Minn. Railway* v. *Gallipean*, 3 Land Dec. 166; *Hastings & Dakota Railway* v. *United States*, 3 Land Dec. 479; *St. Paul &c. Railway* v. *Leech*, 3 Land Dec. 506; *Hastings & Dakota Railway* v. *Whitnall*, 4 Land Dec. 249; and many others of like tenor and effect.

It is true that the decisions of the Land Department on matters of law are not binding upon this court, in any sense. But on questions similar to the one involved in this case they are entitled to great respect at the hands of any court. In *United States* v. *Moore*, 95 U. S. 760, 763, this court said: "The construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration, and ought not to be overruled without cogent reasons. . . . The officers concerned are usually able men, and masters of the subject. Not unfrequently they are the draftsmen of the laws they are afterwards called upon to interpret." See also *Brown* v. *United States*, 113 U. S. 568, 571, and cases there cited; *United States* v. *Burlington &c. Railroad*, 98 U. S. 334, 341; *Kansas Pacific Railroad* v. *Atchison Railroad*, 112 U. S. 414, 418.

Other subsidiary questions have been argued by counsel for plaintiff in error, but they are all virtually disposed of in the foregoing.

For the foregoing reasons we concur with the court below that Turner's homestead entry excepted the land from the operation of the railroad grant; and that upon the cancellation of that entry the tract in question did not inure to the benefit of the company, but reverted to the government and became a part of the public domain, subject to appropriation by the first legal applicant, who, as the record shows, was the defendant in error, Julia D. Whitney, *née* Graham.

The decree of the Supreme Court of Minnesota is    *Affirmed.*